UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
----------------------------------------------------------------X
EDWARD R. GALLAGHER,

                Plaintiff,

        -against-

COLBY VOKEY,
COLBY VOKEY, P.C.,
      A/K/A Colby C. Vokey, P.C.
      A/K/A Law Firm of Colby C. Vokey, P.C.,
PHILLIP STACKHOUSE, a.k.a.
      A/K/A Military Defender,
UNITED AMERICAN PATRIOTS, INC.

              Defendant.
----------------------------------------------------------------X

Docket No.: 19-cv-2196

**COMPLAINT**

Plaintiff EDWARD R. GALLAGHER, by and through his attorneys, Parlatore Law Group,

LLP, states his complaint against Defendants as follows:

<u>**NATURE OF THE ACTION**</u>

1. This is an action for Declaratory Judgement and damages related to the aborted

representation of Plaintiff by Defendants Colby Vokey ("Vokey") and Phillip Stackhouse

("Stackhouse") in the case of *United States v. Special Operations Chief Edward R. Gallagher* in

the Navy/Marine Corps Trial Judiciary (the "criminal case"). Plaintiff, a decorated Navy SEAL,

was accused of murdering an ISIS terrorist during his 2017 deployment to Iraq.

2. While the criminal case revealed instances of serious misconduct by the investigators and

prosecutors, undiscovered and unchallenged by Vokey and Stackhouse, it also revealed a dark and

predatory money-making scheme by Vokey and a "non-profit" United American Patriots, Inc.,

("UAP"). UAP claims to conduct fundraising to provide legal representation to military members

accused of combat-related crimes. However, in reality, UAP targets servicemembers in need to

use for their advertising campaigns, raising millions of dollars to line their pockets while providing very little to the actual legal representation.  Although initially registered and operated as a non-profit, UAP has been illegally repurposed as a cash generating engine to fund the for-profit law practices of Vokey and attorney John Maher ("Maher"), who were both on the Board of UAP. Vokey and Maher both prioritize UAP fundraising over their ethical obligations to provide effective representation to their clients and pursue similar strategies of prolonging cases to maximize their profits, at the expense of the military servicemembers they represent.

3.   At the beginning of the representation, Defendant Vokey induced Plaintiff to allow him to represent him in the criminal case by promising that all legal fees would be covered by UAP and that Plaintiff would not be personally liable for any legal fees or expenses.  Vokey used his position as a member of the Board of Directors of UAP to assure Plaintiff that UAP would take care of everything.

4.   Vokey and Stackhouse allowed Plaintiff to languish in pretrial confinement for several months, while engaging in delay tactics and needlessly running up the legal bills.  As Plaintiff began to realize that he was being taken advantage of and abused by Defendants, he terminated Vokey for cause and severed the relationship with UAP.  Another non-profit, Navy SEALs Fund, Co., ("NSF") took up fundraising on Plaintiff's behalf and a new legal team took over the case. Stackhouse remained on the legal team briefly but quit shortly thereafter. Plaintiff went on to be acquitted of all serious charges at trial.

5.   Although he had never produced any invoices or billing entries during the course of the representation, after his termination, Vokey violated the terms of Plaintiff's pretrial release and the ethical rules on *ex parte* contact with a represented party to present Plaintiff with a stack of outrageously inflated invoices.

6.   Vokey then began serving arbitration demands and a state court lawsuit on Plaintiff before the criminal case was even concluded.  Vokey is demanding up to $1 million in alleged unpaid legal fees.  In support of this outrageous claim, Vokey relies upon a dubious document which purports to be an engagement letter with Plaintiff.  The Plaintiff has no recollection of ever signing the letter, he never received a copy of it, and it is dated on a day when Plaintiff was incarcerated without any legal visitors.

7.   Colby Vokey, through counsel, then threatened NSF by falsely claiming he would place a lien on NSF in an effort to fraudulently induce NSF to send money to Vokey.  On information and belief, Vokey did not attempt to collect money from UAP, the nonprofit entity that agreed to pay Vokey's fees.

8.   Plaintiff is seeking declaratory judgment that he does not owe any legal fees to Vokey or Stackhouse and that, if any fees are due, Vokey and Stackhouse may only recover from UAP, not Plaintiff.

## PARTIES

9.   Plaintiff Edward R. Gallagher, is a Florida resident.

10. At all relevant times, Defendant Colby Vokey ("Vokey") was, and is, a Texas resident.

11. At all relevant times, Defendant Colby Vokey, P.C. (the "Vokey Firm") was, and is, a Texas professional corporation, with its principle place of business in Dallas, Texas.  Although registered with the Texas Department of State under the name Colby Vokey, P.C., Defendant Vokey has used the fictitious names Colby C. Vokey, P.C. and Law Firm of Colby C. Vokey, P.C. on various documents.

12. At all relevant times, Defendant Phillip Stackhouse ("Stackhouse") was, and is, a California resident.  Defendant Stackhouse is an attorney, operating under the name Military

3

Defender.  Although Stackhouse is not licensed to practice law in the State of California, he maintains his principle place of business in San Diego, California.

13. At all relevant times, Defendant United American Patriots, Inc. ("UAP") was, and is, a North Carolina corporation, with its principle place of business in Arlington Virginia.  UAP is a 501(c)(3) non-profit that does business in the State of Texas.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(a)(1), because Plaintiff and Defendant are citizens of different States and the amount in controversy exceeds $75,000, exclusive of interests and costs.

15. Venue is proper in this District, pursuant to 28 U.S.C. §§1391(b)(2), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.  In the alternative, venue is proper in this District, pursuant to 28 U.S.C. §§1391(b)(3), as Defendants Vokey and the Vokey Firm are residents of the Northern District of Texas.

## STATEMENT OF FACTS

### Background of UAP

16. UAP was founded in 2005 by Major Bill Donahue, a Vietnam veteran who wanted to help raise money to provide legal services to military members accused of combat related crimes.

17. According to its website, the UAP is a tax exempt, not-for-profit corporation pursuant to Section 501(c)(3) of the Internal Revenue Service Code.

18. The stated mission of UAP "is to provide funds for legal services to military personnel who have been charged with crimes while in combat."

19. The UAP program that purports to fund legal representation is called the Warrior Fund. Through this program, service members may apply for a sponsorship. According to the UAP website, once an applicant is accepted, he or she can expect to:

> "have the best legal defense team (attorneys, investigators, experts, graphic artists, and legal consultants) funded by UAP to protect his/her rights, and defend against a wrongful accusation or conviction of a "War Crime."

20. In addition to legal defense related expenses, the website also stats that:

> "UAP will provide funding for functional support to assist with a Warrior's reintegration. This may include: training, education, counseling, health care, and legal support; upgrades of military records; access to veteran's benefits; and, if unjustly imprisoned, visitation from loved ones and stipends to help with family needs, books, stamps, magazines, etc…"

21. While UAP may have been started with the best of intentions, as the organization grew and donations moved into the millions, greed took over and the organization began bleeding cash to support the for-profit desires of a few involved individuals, while paying little more than lip service to its stated mission of helping our military members.

22. IRS filings demonstrate that the percentage of UAP donations that actually are used to support the mission of the Warrior Fund is infinitesimal. The most recent filing, for 2017, shows that only 14% of total funds raised by UAP were actually used to support their mission. The filings by UAP for 2016 are even more shocking; only 7% of $3,906,964.00 was utilized to support the mission.

23. Later IRS filings have not yet been made publicly available.

24. Upon information and belief, UAP is fully aware of the serious financial mismanagement and false reporting, as the leadership has been notified both by its own auditors and a CPA of issues that need to be resolved.

25. Upon information and belief major areas of concern that have been outlined by professionals hired by UAP include misclassification of employees as contractors, harassment of employees and contractors by leadership, misappropriation of funds, false reporting to the IRS, and operating as a shell company in order to funnel money to for-profit businesses of attorney, board members including Defendant Vokey.

26. Based on their legal strategy and fundraising timelines, attorney board members are incentivized to move legal cases slowly in order to allow the organization to raise more money. Media attention is monetized to make as much money for the organization as possible.

27. In an irreconcilable conflict of interest, UAP raises significantly more money (and Vokey takes home more money) the longer military members remain in jail.  Endless appeals and clemency petitions are far more valuable to UAP and Vokey than speedy trials and acquittals.

28. Upon information and belief, founder Major Donahue confronted Board Members Maher and Vokey about the large amount of money that each was extracting from UAP for their for-profit endeavors. Soon thereafter, he was removed from his position to ensure that he would not impede Vokey and Maher's money-making efforts.

29. Vokey and Maher then brought in David Gurfein to replace Donahue as the new Vice Chairman of the Board and CEO of UAP. Upon information and belief Mr. Gurfein has a concerning criminal history both during his time in service and as a civilian including harassment and assault of both women and children.

**Background of UAP and Vokey's Involvement in the Criminal Case**

30. In contrast, Plaintiff Edward R. Gallagher has honorably served in the United States Military for over 20 years. In 2017 he completed his 8th combat deployment and served as the Platoon Chief for SEAL Team Seven in Mosul, Iraq. During his last deployment, he was the number one rated chief at SEAL Team Seven Command.

31. In early 2018, seven months after returning from Mosul, Iraq, Plaintiff learned he was the subject of an investigation into alleged law of armed conflict violations. Plaintiff immediately sought legal counsel. Plaintiff was thereafter subjected to almost two years of investigation, arrest, the filing of charges, and almost 11 months of pre-trial confinement. Following a jury trial in July 2019, Plaintiff was acquitted of all serious charges.

32. As an enlisted sailor at the rank of E-7 in the United States Navy, Plaintiff did not possess the necessary resources to fund his own defense in a serious criminal case.  He was referred to Defendant Vokey, because Vokey had made known in the SEAL community that he could represent SEALs free of charge for any combat related case because of his association with UAP

33. Plaintiff believed that due to Defendant Vokey's prior service in the military, he would be in good hands.

34. Defendant Vokey assisted Plaintiff in applying for legal defense funding through the UAP Warrior Fund.  The application was approved and signed by both Vokey and Plaintiff.

35. At the time of Plaintiff's application to UAP, and at all times relevant to this complaint, Defendant Vokey served as a board member for UAP.  Defendant Vokey is still listed as a board member on the UAP filings with the North Carolina Department of the Secretary of State, despite UAP's efforts to rebrand Defendant Vokey's role on their website as a member of the Advisory Board.

36. Plaintiff's application for funding through the UAP's Warrior Fund was approved in April of 2018. At this time the Plaintiff and his family were assured by both UAP as well as Defendant Vokey, that all of their legal defense costs including fees and expenses, as well as travel and support for Plaintiff's family would be covered.

37. In April 2018, Plaintiff, Defendant, and UAP executed a 14-page document (drafted and provided by UAP) which was made up of several sub-documents. The documents include the Petition for Legal Defense Financial Assistance from the Warrior Fund United American Patriots, Document of Understanding and Agreement Contract, Letter to Warrior Fund Recipients, Letter to Warrior Fund Next of Kin, and Letter to Warrior Fund Attorney.

38. The Petition for Legal Defense Financial Assistance from the Warrior Fund United American Patriots includes information about who the Plaintiff is, why he is applying for the sponsorship, that his attorney at the time was Colby Vokey, who his next of kin are, and information about any non-criminal gang/gang activity Affirmation. The document was signed by both the Plaintiff and Defendant Vokey.

39. The Document of Understanding and Agreement Contract outlines the terms of the payment from the Warrior Fund to Defendant Vokey on the Plaintiff's behalf. It explicitly states, that "this is a legal contract." It was provided by UAP as their standard form and signed by the Plaintiff and Defendant Vokey.

40. The Letter to the Warrior Fund Attorney from UAP instructs the defense attorney being supported by UAP on the UAP policy for releasing funds.  This policy purports to require strict

8

adherence to submission of "monthly, accurate reporting of time..." to the UAP.  This document was signed by Defendant Vokey.[1]

41. Based on the contract provided by UAP and signed by both the Plaintiff and Defendant, it was understood by all parties that all legal defense expenses and fees would be submitted solely to UAP by Defendant Vokey. UAP was responsible for reviewing the monthly reports and submitting payment to Defendant Vokey (a sitting board member) on behalf of the Plaintiff.

42. Although not memorialized in any documents signed by Plaintiff, Vokey brought in his friend, Stackhouse, as co-counsel on the case.  Without anything to document the relationship, Vokey assured Plaintiff that Stackhouse would also be paid by UAP.

43. Plaintiff was completely isolated from the billing process.  At no time during the course of Defendant Vokey's representation of Plaintiff, was Plaintiff ever shown a single invoice and, despite requests, was never given any breakdown of any fees allegedly incurred until after he terminated Vokey. Despite numerous requests for information regarding Defendant Vokey's hourly rate, Plaintiff did not learn Defendant Vokey's hourly billing rate until after the representation was terminated.

**NSF Joins the Fundraising Efforts**

44. Six months after Plaintiff signed the contract with UAP and Defendant Vokey, and one month after Plaintiff was arrested and placed in pre-trial confinement, Plaintiff and his family found that UAP was not paying many of the expenses that they had promised to cover.

45. As travel expenses began to mount for Plaintiff (confined in California) and his family (living in Florida), the family determined they would need to raise funds separate from what little

---

[1] This arrangement is ethically problematic, at best, as the participating attorneys are essentially required to violate client confidentiality rules.  The document does not provide for review or approval by the Plaintiff to release these detailed statements and, in fact, despite requests, Plaintiff has never been provided a copy of any of these reports.

the UAP was providing. Plaintiff and his family decided to work with the NSF in effort to raise the needed resources for family expenses.

46. According to its website, NSF is a tax exempt, not-for-profit corporation pursuant to Section 501(c)(3) of the Internal Revenue Service Code.  It is run by volunteers. NSF's structure ensures that 98% or greater of all donations received go directly to support its mission.

47. In order to ensure that everything was completed appropriately, legally, and ethically, the NSF's efforts were coordinated with UAP and Defendant Vokey.  Both UAP and Defendant Vokey reviewed and approved the NSF campaign before it was launched.

48. It was important to UAP that NSF's involvement was limited to fundraising only for family expenses, as UAP wanted to be able to claim that it was solely responsible for covering all legal fees.

49. On information and belief, in addition to the advertising and image purposes, UAP was motivated to ensure that Vokey's billing statements and reports were not shared with NSF or anyone outside of UAP.

50. In October 2018, after Plaintiff had been placed in pre-trial confinement and his family began to incur travel expenses to visit him, Defendant Vokey stated that UAP had not yet started fundraising on Plaintiff's behalf because the charges against Plaintiff had not been publicly announced.  However, Defendant Vokey assured Plaintiff that it would be no problem for UAP to cover all legal expenses "especially since I'm on the board and can have something to say about that."

51. Defendant Vokey also communicated that while UAP could put limitations on any money raised in other cases, there were no limitations on Plaintiff's case "partly because it's me and Phil representing him."

52. Through the aforementioned statements and others, Defendant used his position on the UAP Board of Directors to assure Plaintiff that his legal fees and his family's travel expenses would be fully covered by UAP, and that because of his position he would see to it that no limitations were placed on this agreement.

53. Plaintiff was never informed by UAP or Defendant Vokey that there were any outstanding legal fees and expenses that would not be covered by the Warrior Fund sponsorship and explicitly told Plaintiff that he would not be responsible for the payment of any fees.

54. By early November 2018, Defendant Vokey had been representing the Plaintiff for nearly seven months but never mentioned the need for additional funding or outstanding invoices. Nor did UAP ever notify Plaintiff that his legal fees were outpacing their fundraising efforts or capabilities.

**The Relationship Breaks Down as Vokey and UAP's Unlawful Designs are Revealed**

55. By the end of November 2018, NSF had raised over $200,000 for the Plaintiff and his family. While UAP opts for opacity in its fundraising disclosures, NSF used a ticker on their website to display funds raised on behalf of Plaintiff.

56. After viewing the fundraising ticker on the NSF website, Vokey and Gurfein began to pressure Plaintiff and his wife to have NSF transfer all the money to UAP or Defendant Vokey.

57. On several occasions, Defendant Vokey threatened to alter his legal strategy in Plaintiff's criminal case unless NSF agreed to send Defendant Vokey or UAP all the money that had been raised. These threats included:

    a.   "We're going to have to slow down what we're doing."

    b.   "I've told one expert to stop doing what he's doing."

    c.  "We may have to change our tactics of how we're doing Eddie's case based on this…we have to slow down."

    d.  "We may just not be able to do some of the things we would like to do in his defense"

58. Vokey knew that these representations were false and intended to fraudulently induce NSF to transfer money to UAP or himself at the time that he made these threatening and false representations.

59. Under the military justice system, experts are provided to military members at government expense, regardless of whether the accused is able to hire private counsel.  Vokey's threat to have experts stop work, or to go to trial without experts were undeniably false statements intended to terrify Plaintiff and his family that failure to comply with Vokey's unlawful demands would increase the likelihood that Plaintiff would spend the rest of his life in prison.

60. In addition to Defendant Vokey's constitutionally offensive and ethically repugnant threats to present an inferior defense unless the funds raised by NSF were transferred to Defendant Vokey and UAP, Plaintiff's family also received threats directly from UAP leadership.

61.  On January 18, 2019, Plaintiff's wife received an eight-page letter from Gurfein in which Gurfein threatened that NSF and Plaintiff's family could face "investigations, prosecutions, and associated public scrutiny" unless they transferred all funds raised by the NSF to Defendant Vokey or UAP.  Gurfein even went so far as to insinuate that if the money were not transferred an "anonymous" complaint would be filed.

62. In an effort to resolve the problem and to ensure Plaintiff's case was not negatively impacted by Defendant Vokey, the CEO of NSF requested that Defendant Vokey provide an

itemized list of any outstanding expenses, separate from legal fees, so that NSF could evaluate them and consider covering the expenses.

63. On the same day, Defendant Vokey sent the NSF an invoice for over $90,000 dollars. The invoice provided no detail or explanation of the expenses other than general labels such as "travel expenses," "expert fees," "contract legal research and assistance."

64. In addition to failing to provide any details in regards to the above listed expense categories, the "expert fees" category is additionally problematic because as standard procedure these fees should have been submitted to the Navy for payment and to date, Plaintiff has received no explanation as to why this was not done as is custom for civilian attorneys representing active duty service members.

**Plaintiff Terminates Vokey for Cause and Severs His Relationship with UAP**

65. On March 8, 2019, in response to Gurfein's threatening January letter, Plaintiff's wife sent a letter to Vokey, Stackhouse, Gurfein, and the Board of UAP. In the letter, she objected to Defendant Vokey and Gurfein's use of strongarm tactics and threats to gain access to the funds raised by the NSF. She also demanded disclosure of several items, which were necessary to evaluate whether Plaintiff would continue his relationship with UAP and Stackhouse:

   a. Copies of Vokey's invoices;
   b. Vokey's claimed hourly rate;
   c. A list of expert witnesses and an explanation as to why their expenses were not submitted for government remittance per standard practice;
   d. For what purpose Vokey incurred extraordinarily high postage expenses;
   e. A breakdown of fees provided to Stackhouse;
   f. Detailed records of payments UAP made to Vokey or Stackhouse to include dates, amounts, and invoices; and,
   g. Accounting of all donations received by UAP earmarked for Plaintiff.

66. Vokey failed to respond to this letter and provided no responsive documents.

67. In a letter to Plaintiff's wife dated March 15, 2019, UAP ignored Plaintiff's request for transparency on the fees and expenses related to his legal defense.  Instead, the letter, signed by the UAP Vice-Chairman and Treasurer, attempted to shore up the reputation and efforts of Defendant Vokey and Gurfein.

68. On March 19, 2019, Plaintiff terminated his relationship with UAP due to Defendant Vokey and UAPs lack of transparency and refusal to provide any legal fee and expense information.

69. As part of the severing of the relationship, UAP was directed to cease using Plaintiff's likeness and story for its fundraising efforts that same day. UAP ignored this demand and improperly and fraudulently continued for two weeks to use Plaintiff's likeness and story for its fundraising efforts, only stopping after multiple cease and desist demands.

70. Defendant Vokey's refusal to provide any documentation, either regarding his billing, or his communications with UAP regarding his representation of Plaintiff is a violation of his professional duties to his client.

71. In the March 19, 2019 termination letter, which was sent to Vokey and UAP, Plaintiff explicitly stated:

> As to Mr. Vokey's alleged past due invoices, we believe that these were fraudulently inflated and represented no value added to Eddie's case. However, rather than fight about billing improprieties, we will just consider this to be a matter to be handled between UAP and Mr. Vokey.

72. At no time did UAP indicate that they disagreed or disputed the assertion that the invoices were a matter to be resolved between UAP and Vokey, or that UAP believed that Plaintiff would be personally responsible for this bill.

73. Similarly, Vokey did not object to this statement at the time.  It was much later that he began to act on the mistaken premise that Plaintiff would be personally responsible.

14

74. On information and belief, UAP has paid Vokey somewhere between $80,000 and $250,000 for his invoices on Plaintiff's case.

### Stackhouse Runs up the Bill and Runs Away

75. The termination of Plaintiff's relationship with UAP and Defendant Vokey did not extend to Plaintiff's relationship with Defendant Stackhouse.

76. Plaintiff determined that Defendant Stackhouse would continue his legal representation of Plaintiff, in coordination with his new counsel, with the clear requirement that Defendant Stackhouse would continue to pursue a speedy trial and utilize a more aggressive legal strategy.

77. Rather than employ a more aggressive defense strategy, Stackhouse instead employed a more aggressive billing strategy, billing for many hours of meetings and motions drafting with little or nothing to show for it.

78. Soon thereafter, Stackhouse quit because he didn't agree with the more aggressive defense strategy.  Upon his withdrawal, it was revealed that, despite claiming significant hours expended on motion drafting, the only non-boilerplate motion produced was an unusable and frivolous motion to dismiss on 1st Amendment grounds.

### Post Termination Collection Efforts

79. In March of 2019, Plaintiff was moved to less restrictive confinement but was still required to receive pre-approval of any visitors from his command.

80. In violation of these requirements, and without providing any notice, Defendant Vokey made an unannounced visit to Plaintiff in May of 2019, just days before the trial was scheduled to commence in order to provide him with a stack of invoices and demand payment.

81. Defendant Vokey was instructed not to take any further actions to violate the conditions of Plaintiff's release, to direct all collections efforts towards UAP, and to have no further *ex parte* communications with Plaintiff, a represented party.

82. Upon information and belief Defendant Vokey has not attempted to recover any outstanding legal fees from UAP despite UAP agreeing to cover Plaintiff's legal defense fees and expenses.

83. On or about August 1, 2019, Defendant Vokey, through counsel, served Plaintiff with an arbitration demand, which is purported to be based on a separate engagement letter between Plaintiff and an entity with a similar name to the Vokey Firm.  This demand seeks fees up to $1 million.

84. The purported engagement letter relied upon in the arbitration demand is of dubious authenticity, as Plaintiff does not recall ever receiving or signing a new contract. Additionally, Client was in pre-trial confinement which required guests to sign a logbook, in which there is no evidence of any visitors on the day Defendant Vokey asserts the new contract was executed. Moreover, despite several questionable billing entries, Vokey's invoices do not indicate that there were any meetings with the incarcerated Plaintiff at the time that the purported engagement letter was allegedly signed.

85. On August 6, 2019, Vokey, through counsel, sent a letter to NSF that contained false and fraudulent statements in an effort to induce them to pay Vokey.  The letter is fashioned as a "Notice of Lien," even though there is no legal basis for Vokey to assert a lien against NSF and makes no reference to the amount of this false lien.  The letter closes with a threat to "hold the Navy Seals Fund responsible."

86. On information and belief, Vokey did not send a similar "Notice of Lien" to UAP.

87. On or about August 16, 2019, Vokey filed a lawsuit against Plaintiff in the County Court of Dallas County asserting the same frivolous claims and relying upon the same fraudulent engagement letter.

88. Similarly, Stackhouse has presented Plaintiff with outrageously inflated billing statements, on which he has demanded payment.  However, while Stackhouse has resisted efforts to settle his claim, he has not filed any action against Plaintiff.

89. Plaintiff's criminal case has not yet completed, as the disposition is still under final review by the Chief of Naval Operations.  At the time of this filing, it is unclear whether Plaintiff will be permitted to retire, or whether he may lose his pension.  With his pension in doubt and very little savings, Vokey's demand for up to $1 million represents a severe stress on a family that has already been put through the ringer, aggravated by Vokey's misbehavior and mishandling of the case before his termination.

90. Vokey has demonstrated utter disregard for both the facts and the law in pursuing collection efforts against Plaintiff.

**UAP Conducts Damage Control**

91. Vokey's reckless actions have also brought UAP into the crosshairs, as there can be no adjudication of the dispute between Plaintiff and Vokey without UAP.

92. In an effort to control the damage caused by their handling of this matter, and Vokey's actions, UAP has repeatedly published false information about its agreement with the Plaintiff and Defendant, as well as attempting to falsely distance UAP from Vokey.

93. On August 8, 2019, UAP posted to a public Facebook page a statement in which it falsely asserted that it had no contract with Plaintiff and that Plaintiff had entered into a private contract with Defendant Vokey.  This was a knowingly false statement; the only contract executed between

Plaintiff and Defendant Vokey was the one on UAP letterhead titled "Document of Understanding and Agreement Contract: This is a Legal Contract Read Carefully." Additionally, UAP provided a letter to Defendant Vokey outlining the terms of their payments for "all legal expenses" which was signed only by Defendant Vokey and not the Plaintiff.

94. As set forth above, Defendant Vokey convinced Plaintiff that because of his position on the UAP Board of Directors, Plaintiff should have no concerns in regard to funding his legal defense. In the UAP statement dated August 8, 2019, however, UAP asserted that Defendant is on an "advisory board," not the Board of Directors, and that "when attorneys were on the UAP's Board of Directors they were not eligible to vote on, nor make decisions related to, any matter which they may be representing or litigating." Defendant's statements directly contradict those made by UAP.

95. UAP also continues to assert that they pay all legal fees on behalf of warriors regardless of who the warrior chooses as their attorney. Ironically, they have not paid the outstanding invoices Defendant Vokey asserts he is owed.

## AS AND FOR A FIRST CAUSE OF ACTION

### Declaratory Judgment

### (against all Defendants)

96. Repeats and realleges all the allegations set forth above as if fully alleged herein.

97. An actual controversy has arisen and now exists between Plaintiff and Defendants concerning the following matters:

a. Whether Vokey, the Vokey Firm, or Stackhouse are entitled to any legal fees;

b. Whether Vokey's termination for cause operates to forfeit any fees owed;

     c.  Whether the engagement letter, dated October 11, 2019, is an authentic and valid contract;

     d.  If Vokey, the Vokey Firm, or Stackhouse are owed any fees, whether UAP is obligated to pay instead of Plaintiff;

98.  All necessary parties are before this Court.

99.  The amount in controversy exceeds the jurisdictional threshold of this Court.

100. Plaintiff does not have an adequate remedy at law.

101. Judicial declarations are necessary and appropriate at this time to enable the parties to ascertain their rights and duties to each other.

102. Based upon the foregoing, Plaintiff seeks a declaratory judgment pursuant to 28 U.S.C. § 2201, determining as follows:

     a.  Vokey, the Vokey Firm, and Stackhouse are not owed any fees; or

     b.  If Vokey, the Vokey Firm, or Stackhouse are owed any fees, UAP is obligated to pay, not Plaintiff.

103. Plaintiff has already suffered damages by Vokey's choice to file a lawsuit against him before the criminal case is even concluded.  Therefore, even though Plaintiff has pleaded additional causes of action, for which a jury trial is demanded, a separate speedy hearing on the declaratory-judgment action is appropriate, pursuant to Rule 57 of the Federal Rules of Civil Procedure.

## AS AND FOR A SECOND CAUSE OF ACTION

### Breach of Fiduciary Duty

### (against Defendant Vokey)

104. Repeats and realleges all the allegations set forth above as if fully alleged herein.

105. As Plaintiff's former attorney, a fiduciary relationship existed between Plaintiff and Defendant Vokey.

106. Defendant Vokey owes a duty of loyalty to Plaintiff and, particularly, a duty not to act in any way detrimental to the outcome of the criminal case in which Vokey represented Plaintiff.

107. Defendant Vokey breached this fiduciary duty to Plaintiff by filing a lawsuit against him while the underlying criminal case is still pending.

108. Defendant Vokey breached this fiduciary duty to Plaintiff by asserting a false lien against the NSF, who is still paying Plaintiff's legal fees for the criminal case.  In fact, Defendant Vokey threatened that if NSF paid money to Plaintiff's current legal team, instead of Vokey, he would "take the necessary action to hold the Navy Seal Fund responsible."

109. Defendant Vokey's actions to publicly undermine Plaintiff, while his final action is under consideration by the Chief of Naval Operations, as well as his attempt to stop payments to his current legal team while post-conviction submissions are being prepared for submission is a breach of his fiduciary duty to Plaintiff and threatens to cause Plaintiff irreparable harm.

110. ; Plaintiff has been damaged by Defendant's wrongful conduct in an amount to be determined at a trial by jury, but in no event less than the $75,000 jurisdictional threshold of this Court.

111. In addition, because Defendant's conduct was so willful, wanton and malicious, punitive damages should be awarded in an amount to be determined at trial, but in no event less than

$1,000,000.

## AS AND FOR A THIRD CAUSE OF ACTION

### Legal Malpractice

### (against Defendants Vokey and Stackhouse)

112. Repeats and realleges all the allegations set forth above as if fully alleged herein.

113. Defendants Vokey and Stackhouse owed a Plaintiff a duty of competent representation.

114. Defendants Vokey and Stackhouse failed to pursue an aggressive defense strategy on Plaintiff's behalf.  Instead, they engaged in delay tactics and prioritized UAP fundraising efforts over efforts to resolve the case quickly, efficiently, and effectively.

115. Defendants Vokey and Stackhouse's negligent acts or omissions breached that duty.

116.  Defendants Vokey and Stackhouse's breach proximately causes the plaintiff's injury – to wit, Plaintiff languished in jail for many months longer than necessary.

117. But for Defendants negligent acts or omissions, Plaintiff would not have suffered the loss of his liberty for as long as he did.

118. Plaintiff has been damaged by Defendants wrongful conduct in an amount to be determined at trial, but in no event less than the $75,000 jurisdictional threshold of this Court.

119. In addition, because Defendant's conduct was so willful, wanton and malicious, punitive damages should be awarded in an amount to be determined at a trial by jury, but in no event less than $1,000,000.

WHEREFORE, Plaintiff demands judgment as follows:

A.   An award of compensatory and punitive damages against Defendant as determined at trial;

B.   An award of the costs and disbursements of this action; and

21

C.  Such other and further relief as this Court deems appropriate.

Dated:  September 13, 2019
        New York, New York

Respectfully submitted,

Timothy C. Parlatore, Esq.
Parlatore Law Group, LLP
*Counsel for the Plaintiff*
One World Trade Center, Suite 8500
New York, New York 10007
212-679-6312
212-202-4787 Facsimile
timothy.parlatore@parlatorelawgroup.com